Joshua E. Abraham, Esq. (JA1818)
380 Madison Avenue, 22nd Floor
New York, New York 10017
T: (646) 245-6710
F: (646) 201-4454
josh@joshabrahamlaw.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN BORNSTEIN, <br><br> Plaintiff, <br><br> -against- <br><br> THE CITY OF NEW YORK and POLICE OFFICER JAMES GROGAN, <br><br> Defendants. | 13-CIV-2385-JSR <br><br> **ORIGINAL COMPLAINT** <br><br> **ECF CASE** |

Plaintiff Jonathan Bornstein, by his undersigned counsel, as and for his Complaint against defendants the City of New York and Police Officer James Grogan, alleges upon knowledge as to himself, and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1. This case arises from a September 17, 2012 incident in which a member of the New York City Police Department, acting under color of state law, subjected Plaintiff to a false arrest without any probable cause or other justification, depriving Plaintiff of his rights secured by the Fourth and Fourteenth Amendments to the Unites States Constitution. By this action, and as described more fully herein, Plaintiff seeks relief for Defendants' misconduct pursuant to 42 U.S.C. § 1983.

**JURISDICTION AND VENUE**

2.	This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the Unites States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.	Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) in that Defendant City of New York is administratively located within the Southern District of New York, and the events giving rise to this claim occurred with the boundaries of the Southern District of New York.

**JURY TRIAL DEMANDED**

4.	Plaintiff demands a trial by jury on the claim pleaded herein.

**PARTIES**

5.	Plaintiff Jonathan Bornstein, a citizen of the Unites States, is and was at all times relevant herein a resident of Bronx, New York.

6.	Defendant City of New York is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers. Defendant City of New York was at all times relevant herein the employer of individual defendant, Police Officer James Grogan.

7. Police Officer James Grogan is and was at all times relevant herein a member of the New York City Police Department, assigned to the 50th Precinct at 3450 Kingsbridge Avenue, Bronx, New York, 10463. Police Officer James Grogan's shield number is 25590.

## FACTUAL BACKGROUND

8. Plaintiff Jonathan Bornstein ("Jonathan") is a resident of the Riverdale section of the Bronx. Jonathan is married to Rosa Silverio Bornstein ("Rosa"). Jonathan and Rosa have two young children, L. (a girl) and A. (a boy).

9. Jonathan and Rosa are currently parties to a divorce proceeding pending in the Supreme Court of the State of New, County of Bronx. Jonathan initiated the divorce after discovering that Rosa had engaged in a long-standing extramarital affair with a co-worker, a teacher at a public high school in Manhattan.

10. Soon after her marital affair was discovered, Rosa found it convenient to level false accusations of misconduct – and even violence – against Jonathan in order to gain an advantage in the divorce proceedings. From the outset, and during the course of the proceedings, Rosa has filed numerous false Domestic Incident Reports ("DIRs") with police officers at the 50th Precinct, and has secured several orders of protection against Jonathan.

11. Unfortunately, Rosa's campaign against Jonathan had the intended result: Jonathan lost custody of his children during the divorce proceedings, and is now permitted only temporary and limited visitation pursuant to court orders.

12. On the few occasions Jonathan is allowed to spend time with his children – primarily his son – Rosa brings A. to the 50th Precinct at specific court-ordered times, and hands A. over to Jonathan. Similarly, Jonathan returns A. to Rosa specifically at the 50th Precinct, and only at the times stipulated by the court.

13.     Rosa's inveterate and tactical filings of DIRs have made her a mainstay at the 50th Precinct.  And her constant and hyperbolic tales of neglect and woe have endeared her in particular to Police Officer James Grogan ("Grogan").

14.     Grogan frequently assists Rosa in filling out DIRs against Jonathan and, upon information and belief, offers her counsel and encouragement.  Conversely, Grogan often speaks harshly to Jonathan and adopts a gruff and bellicose demeanor when the two interact.

15.     Indeed, Grogan appears to take pleasure in this domineering disposition.  On one particular occasion in 2012, when two of Jonathan's friends – Michelle Zimmer and Irving Baldeon – were at the 50th Precinct on a related matter, Grogan noted Jonathan's absence and stated he knew the reason: "he knows I want to arrest him."  Jonathan has since been particularly circumspect when engaging Grogan, and has tried to avoid Grogan as much as possible.

16.     Grogan's ire, however, eventually caught up with Jonathan on September 17, 2012, as discussed more fully below.

17.     Rosh Hashanah – the two-day Jewish New-Year holiday – fell on September 17 and 18, 2012.  Jonathan, wanting to spend the holiday with his son A., petitioned the Court for visitation rights. The court subsequently granted Jonathan's application and ordered Rosa to bring A. to Jonathan at the 50th Precinct at 10 a.m. on September 16, 2012.

18.     On September 16, 2012, at a few minutes before 10 a.m., Jonathan arrived by car at the 50th Precinct to pick up his son.  He was accompanied by Michelle Zimmer ("Michelle").

19.     Jonathan parked his car in a spot near the precinct's front door.  Jonathan then entered the precinct to look for Rosa and A.  He did not see them. Satisfied that Rosa and A. were not in the precinct, Jonathan then returned to his car.  Jonathan and Michelle proceeded to

wait in the car for approximately 30 minutes, hoping to see Rosa and A. arrive at the front door. During this time, Jonathan and Michelle had a clear and full view of the precinct entrance.

20. Seeing no sign of Rosa, Jonathan again entered the precinct at approximately 10:30 a.m. While inside, Jonathan inquired from Officer Hayden, who was manning the front desk, if he had seen Rosa. Officer Hayden replied that he had not seen Rosa all morning.

21. After speaking with Officer Hayden, Jonathan left the precinct. He was dejected at what he believed to be Rosa's willful refusal to allow him to spend time with his son. Jonathan dropped Michelle off near her home in Riverdale, and proceeded to Fairway Market for pre-holiday grocery shopping, and other last minute errands.

22. Sometime after being dropped off in Riverdale, Michelle decided to see if she could intercede directly with Rosa to convince her to allow A. to spend the holiday with his father. Without telling Jonathan, Michelle walked a few blocks to Rosa's building and knocked on Rosa's apartment door. Rosa opened the door.

23. Michelle explained the situation and requested that Rosa allow A. to spend time with his father over Rosh Hashanah. Rosa demurred. She claimed, in a manic and frazzled tone, that she had, in fact, been at the precinct at 10:00 a.m., and that it was Jonathan who failed to appear. After more discussion, however, Rosa seemed to relent and agreed, at the very least, to call Grogan and seek his advice.

24. Jonathan, meanwhile, was not aware of Michelle's intercession. At approximately 1 p.m., after finishing his Rosh Hashanah grocery shopping at Fairway, Jonathan returned to the 50th Precinct. He approached the front desk and asked Officer Hayden once again if Rosa had arrived at the precinct to drop A. off. Officer Hayden confirmed that he had not seen her.

5

25. Jonathan also spoke with another police officer, Officer Michael Kreiman, who suggested Jonathan fill out a formal DIR to memorialize Rosa's breach of the court's Rosh Hashanah visitation order. Officer Kreiman proceeded to take Jonathan's statement and they jointly filled out a DIR. Jonathan's September 16, 2012 DIR states: "Rosa Silverio failed to abide by the order to deliver [A.] before the ordered visit for Rosh Hashana. Drop off time is 10 a.m."

26. After completing the DIR, Jonathan returned to his car and drove back to Riverdale. When he arrived home, Jonathan received a call from Michelle. Michelle told Jonathan she had spoken with Rosa and Rosa had agreed to speak with Grogan, possibly to arrange for a drop-off of A. later in the afternoon. Jonathan then picked up Michelle who was standing a few blocks from Rosa's home.

27. After Michelle got into car, Jonathan called Grogan on speakerphone. Jonathan informed Grogan that Michelle had spoken with Rosa and that Rosa was going to call him to discuss making arrangement for A. to spend time with Jonathan over the holiday. At first, Grogan stated that he preferred the parties make arrangements through their attorneys. But, when the parties were unable to reach their attorneys, Grogan agreed to accept Rosa's call. Eventually, Grogan began acting as a go-between, and ultimately instructed to Rosa to ask Michelle to return to the apartment to pick up A. right before the start of Rosh Hashanah. Michelle had succeeded in securing A.'s visitation with Jonathan for the holiday.

28. Jonathan was thrilled to be spending Rosh Hashanah with his son. Jonathan and A. attended synagogue and ate the festive meal together which Michelle had prepared. They studied Torah and worked on art projects. And on the next day, September 17, 2012, Jonathan took A. to a local park for a nature walk.

29. During their time at the park, however, Jonathan received an unexpected phone call. It was Grogan. He demanded Jonathan return to the precinct and "turn himself in" to be arrested. Grogan refused to explain the reason over the phone.

30. Soon after, at approximately 2:30 p.m., Michelle drove Jonathan and A. from the park to the 50th Precinct. After parking the car, Jonathan, A., and Michelle entered the precinct. Grogan immediately accosted them, blocked the front door, and stated loudly that he was going to arrest Jonathan "in front of your son." When asked the reason for the arrest, Grogan replied, "for lying." Grogan alleged that Jonathan had filed a false DIR the previous day with Officer Kreiman. According to Grogan, Jonathan had "no basis" for filing the DIR because Jonathan was "not at the precinct yesterday at 10."

31. Jonathan and Michelle pleaded with Grogan to reconsider his decision. Michelle stated directly to Grogan that she was with Jonathan the morning of the 16th and observed him enter the precinct at 10 a.m. and again at 10:30 a.m. to look for his son. Jonathan, in turn, stated that he spoke with Officer Hayden _twice_ during the day, and at both times Officer Hayden confirmed that he had not seen Rosa in the precinct. Incredibly, Grogan acknowledged that Officer Hayden gave information to Jonathan that Rosa was not at the precinct on September 16th, but stated this fact would not change his determination. Jonathan and Michelle then begged Grogan not to make the arrest on Rosh Hashanah, explaining that it was the equivalent of "Christmas." But Grogan arrested Jonathan anyway. Rolling his eyes with dramatic affect, Grogan placed Jonathan in handcuffs.

32. Jonathan was arrested and charged with a violation of New York Penal Law § 240.50(3)(a), "Falsely reporting an incident in the third degree."

7

33. There was, however, no basis for the arrest; and the District Attorney's office declined to prosecute. In a report typed by Senior DAT Coordinator Valerie J. Rodriguez on February 7, 2013, the District Attorney's office informed Jonathan that "[t]he People decline to prosecute the instant matter due to insufficient evidence … arresting officer cannot prove that the defendant did not appear for … visitation and that there is no video surveillance."

34. Indeed, Grogan's thread-bare basis for arresting Jonathan would later be revealed during a hearing in Jonathan and Rosa's divorce proceeding.

35. Confident in Grogan's past solicitude, Rosa actually called Grogan to testify in the couple's divorce proceeding on February 21, 2013, and again on March 4, 2013. Rosa hoped to use Grogan's testimony to demonstrate Jonathan's past misconduct and to deny him further visitation with A.

36. At the February 21, 2013 and March 4, 2013 hearings, Grogan was asked under oath to recount the events of September 16 and 17, 2012. Grogan testified that he arrived for work at the 50th Precinct on September 16, 2012, at approximately 9:25 a.m. Grogan testified that he entered through the "back door" – not the front – of the precinct. He testified that when he arrived he saw Rosa and A. waiting at the precinct, a full 35 minutes before the scheduled drop-off. Significantly, Grogan testified that this was the first time he had actually seen Rosa come to the precinct to exchange the children: "I never observed them exchange the children. I'm never there at the time of their scheduled pick up and drop off."

37. After seeing Rosa, Grogan testified, "I grabbed my paperwork and I went upstairs to my office." According to Grogan, Rosa did not follow him upstairs.

38. At 10:15 a.m., Grogan "received a call from a civilian worker that works downstairs in the precinct. She said there's a lady down here that wants to fill out a DIR. I said

8

fine, send her up." It was Rosa. "When [Rosa] walked into [Grogan's] office she said that [Jonathan] didn't show up for the 10:00 pick up." Grogan then "had her fill out a DIR."

39. Grogan testified that "when the DIR was filled out … it was brought to my attention [by Rosa] that Michelle Zimmer had called [Rosa's] neighbor." According to Rosa, "Michelle Zimmer told the neighbor that they messed up on the time of the pick up." Explaining the importance of Rosa's allegation concerning the unnamed "neighbor," Grogan testified that "[the neighbor] was a witness to the case when I arrested Mr. Bornstein for filing a false police report. I believe she had knowledge, yes, he did mess up on the time and he was not there in the morning."

40. Grogan, on direct examination, summed up his rationale for arresting Jonathan on September 17, 2012. When asked "why" he "arrested Mr. Bornstein," he replied: "Because I <u>believed</u> that DIR he filled out the previous day he filed falsely. <u>Because his DIR stated he was there at 10:00</u>." (Emphasis supplied.) Thus, Grogan arrested Jonathan because he "believed" Jonathan had lied in an official police filing about his presence at the 50th Precinct on September 16, 2012, at 10 a.m.

41. The true basis of Grogan's "belief," however, was laid bare during cross examination. On cross, Grogan confirmed that when he arrived for work on September 16, 2012, he went directly to his office on the second floor of the precinct, and remained there for most of the day. Grogan confirmed that Rosa went up to his office to fill out a DIR at "approximately 10:15."

42. But Grogan also admitted that because he was in his second-floor office far removed from the lobby, he had no way of observing whether Jonathan did or did not enter the precinct at 10:00 a.m. that morning. Critically, when asked, "You don't know whether or not

9

Mr. Bornstein came into the police station between 10:00 and 10:15 and simply did not see Ms. Bornstein," Grogan replied "Correct." And when asked if it was "possible that between 10 a.m. and 11 a.m. at that particular time frame that Mr. Borsntein was there," Grogan replied, "It's a possibility." Finally, responding to a question asked by the judge, who apparently was amazed at Grogan's testimony, Grogan confirmed that his office does not even have a window and that he had no view of the lobby of the precinct.

43. Grogan also admitted that the supposed "witness" who could establish Jonathan's alleged absence from the precinct that morning – the purported "neighbor" identified by Rosa – was not a determining factor in his decision to arrest Jonathan. Shockingly, Grogan revealed that he did not even call the "neighbor" on September 16th or 17th, or at any time before the arrest to corroborate Rosa's second-hand account. Instead, Grogan testified that the first time he actually spoke with the "neighbor" concerning the events of September 16th and 17th was in "December," two months after the arrest!

44. Curiously, Grogan did not state in his testimony whether the "neighbor" was ultimately able to verify Rosa's statement concerning Michelle Zimmer and the purported "mess up," although Grogan did share with the District Attorney's the nature of his conversation with the "neighbor." Presumably, the "neighbor's" failure to confirm Rosa's allegation played an important role in the District Attorney's decision not to prosecute Jonathan. In fact, Michelle Zimmer never called any "neighbor" of Rosa on September 16th or 17th, 2012: this supporting fact was entirely fabricated by Rosa.

45. In sum, Grogan testified that he arrested Jonathan because he "believed" Jonathan had lied about his whereabouts on September 16, 2012, at 10:00 a.m. And Grogan testified that he arrived at this "belief" and arrested Jonathan, (i) despite working in an office on the second

10

floor of the 50th Precinct without a view of lobby and thus, was unable to determine who was actually entering and exiting the building at 10:00 a.m.; (ii) despite admitting under oath that it was possible Jonathan was in fact at the precinct at 10:00 a.m. that morning to pick up his son; (iii) despite the contemporaneous testimony of an eye witness – Michelle Zimmer – stating directly to Grogan that Jonathan was in fact at the precinct to pick up his son at 10:00 a.m.; (iv) despite admitting that he had never previously witnessed Rosa picking up and dropping off the Bornstein children – and was clearly unfamiliar with the parties' court-ordered visitation protocols; and (v) without even bothering to call or otherwise contact Rosa's mystery "neighbor" to confirm Rosa's improbable third-hand tale that Michelle Zimmer (not Jonathan) had allegedly "admitted" that Jonathan did not show up at 10:00 a.m.

46. Thus, Grogan arrested Jonathan on Rosh Hashanah and in front of Jonathan's son simply because he "believed" with no objective basis that Jonathan had lied. Grogan had no evidence to justify the arrest, and indeed made no effort to investigate Rosa's claim that Jonathan did not arrive at the 50th Precinct to pick up his son at the court-ordered time. At the end of the day, Grogan had no probable cause whatsoever to arrest Jonathan. At best, Grogan based the arrest on a gut instinct of misconduct colored by his personal views of Jonathan and Rosa's divorce. At worst, Grogan used the events of September 16, 2012, to finally do what he had been planning all along: arrest Jonathan Bornstein for the sport of it.

## AS AND FOR A CAUSE OF ACTION

### Deprivation of Rights Under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 by Means of False Arrest

47. Plaintiff incorporates herein all the allegations set forth above.

48. As demonstrated herein, the conduct and actions of Defendants on September 17, 2012, in arresting and detaining Plaintiff, violated Plaintiff's rights under the Fourth Amendment

11

to the United States Constitution, which protects "persons, houses, papers, and effects against unreasonable searched and seizures."

49.     The conduct and actions of Defendants on September 17, 2012, acting under color of law, in arresting and detaining Plaintiff without probable cause, was done intentionally, maliciously, with a deliberate indifference and/or with reckless disregard for the natural consequences of their acts, was done without lawful justification or reason, and was designed and did cause Plaintiff specific and serious damage.

50.     As a direct and proximate result of the foregoing, Plaintiff was deprived of his liberty, suffered significant emotional pain and suffering, was subject to great humiliation in front of his son, and was otherwise damaged and injured.

51.     Plaintiff seeks damages for Defendants' misconduct and recovery of his attorney's fees and litigation expenses incurred as a result of having to prosecute this action, as provided by 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff requests judgment against Defendant as follows:

a)      Compensatory damages in an amount to be determined at trial;

b)      Punitive damages in an amount to be determined at trial;

c)      Attorney's fees, litigation expenses, costs and disbursements of this action; and

d)      Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        April 10, 2013

**JOSHUA E. ABRAHAM, ESQ.**

*[signature]*

_____
380 Madison Ave, 22nd Floor
New York, New York 10017

12

T: (646) 245-6710
F: (646) 201-4454
josh@joshabrahamlaw.com

*Attorney for Plaintiff Jonathan Bornstein*